Filed 3/22/23  P. v. Miller CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RAYSHOUN GLENN MILLER,<br><br>    Defendant and Appellant. | F082858<br><br>(Super. Ct. No. BF177511A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David R. Zulfa, Judge.

Spolin Law and Aaron Spolin for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Rayshoun Glenn Miller was convicted by jury of human trafficking (Pen. Code,[1] § 236.1, subd. (b); count 1); pimping (§ 266h, subd. (a); count 2); and pandering (§ 266i, subd. (a)(1); count 3).  In a bifurcated court trial, the court found true

---

[1]    All further undesignated statutory references are to the Penal Code.

an allegation that appellant had suffered a prior strike offense (§§ 667, subds. (c)-(j); 1170.12, subds. (a)-(e)).

As to count 1, appellant was sentenced to the upper term of 20 years, doubled to 40 years for the strike prior. As to counts 2 and 3, appellant was sentenced to the upper term of six years, doubled to 12 years for each count, and the court stayed punishment as to both counts pursuant to section 654.

On appeal, appellant contends the court erred by declining to grant his request at the beginning of his trial for a continuance to retain private counsel in place of his court-appointed attorney. In supplemental briefing, he further contends he is entitled to resentencing in light of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567). Respondent concedes remand for resentencing is appropriate. We accept respondent's concession and remand for resentencing. In all other respects, we affirm the judgment.

## FACTS

Sierra testified that she moved to Fresno from Ohio in 2018 to live with her infant son's father and his family. When her son's father was arrested and went to jail, his family kicked Sierra out, and she became homeless. She was about 21 years old and did not have a job or source of income. In February 2019, shortly after she was kicked out, she met a woman named Marshai, who told her she and her son could stay with her.

About 30 minutes after Sierra arrived at Marshai's apartment with her son, appellant arrived as well, and Marshai encouraged Sierra to talk to him. Appellant asked Sierra what she wanted to do with her life and told her she could make money out of town. He gave Sierra his phone number and instructed her to delete all her phone contacts and social media accounts. Sierra gave all her money to appellant. Later that day, Sierra and appellant took her son to appellant's mother's house and dropped him off there, and appellant took Sierra to get her nails done.

The next morning, Sierra, Marshai, and another woman went to a motel in Bakersfield via an Uber paid for by appellant. Marshai paid for a motel room in cash.

2.

Sierra was not sure what she would be doing, just that she could make money doing an unspecified task. Sierra learned, however, she was there to prostitute herself. Sierra was not ok with prostituting herself but had no way to leave, as she had no money.

Once the three women had their room, a man came to the door and "picked" Sierra out of the three women, and she had sex with him in exchange for money while Marshai and the other woman waited in the bathroom. Sierra gave the money to Marshai, who in turn sent the money to appellant. Men continued to come to the motel room, and it was the "same thing over and over again." Sierra did not keep any money from the acts of prostitution. She, Marshai, and the other woman all engaged in acts of prostitution, and she and the other woman both gave their money to Marshai. On one occasion, Sierra transferred money directly to appellant. Sierra made about $500 per day and kept none of it because she "wasn't allowed to." Marshai taught Sierra "everything that [she] was supposed to do."

Sierra was at the motel engaging in prostitution for two weeks. Over the course of those two weeks, she had between 10 and 20 "dates," and performed sexual acts such as sexual intercourse, oral sex, and "hand jobs." Sierra never left the room; she ordered food through UberEats, which was paid for by appellant. She had to ask appellant permission to leave the room to get snacks. At one point, Marshai took her to the mall and bought her clothes with cash. Sierra and the other women took half-naked selfies, which were placed on a website with a description and phone number where men could call and plan "dates." Sierra did not want to engage in prostitution, but she had no way to leave and she did not know if she would get to see her son if she left. On one occasion, appellant showed up in Bakersfield because the women were not answering their phones as they were asleep. He told them to get up because they were not supposed to be sleeping and then left.

After two weeks, Sierra, Marshai, and Sandy, another woman who was in a different room at the motel when Sierra and Marshai arrived, went back to Fresno in an

3.

Uber and stayed for a day or two. Appellant brought Sierra to see her son, and she got to see him for two hours at Marshai's apartment. Her son was sick and underweight. She was upset and told Marshai, but nothing was done. Appellant took Sierra's son back to his mother's house. Sierra let him because she did not know him well and did not know what he would do to her. She wanted to spend the night with her son, but appellant told her she could not. At one point, she went to Planned Parenthood with Marshai, appellant, and Sandy to get checked for sexually transmitted diseases and to get condoms.

While in Fresno, appellant "beat the shit out of" Sierra because she had been arguing with Sandy. He choked her, slammed her to the couch, and backhanded her across the face. Sierra was afraid appellant would kill her.

Sierra also testified she had a romantic relationship with appellant, and that she had sex with him, as well as with him and Marshai, at Marshai's house.

After the short stay in Fresno, Sierra returned to the motel in Bakersfield with Marshai in an Uber paid for by appellant. When she returned to Bakersfield, it was "the same thing over again." Sierra was scared to leave, was scared of appellant, and was afraid she would get back to Fresno and not know where her son was.

Shortly after Sierra returned to Bakersfield, she decided to stop doing what she was doing because she missed her son and felt like she had no freedom. She texted her friend, and her friend called the police. The police arrived at her motel room while she was with a "date" engaging in prostitution and arrested her. Police later were able to recover Sierra's son.

Detective Frank McIntyre testified Sierra identified appellant as a "pimp" and Marshai as a "bottom," which McIntyre described as a woman who has had a long established relationship with the pimp and serves as the "enforcer" or the person who explains the rules to the prostitute and works alongside them to get the prostitute "up to par with what the pimp wants from her." Sierra informed McIntyre she was to text or call appellant before every sexual transaction for approval of the monetary amounts she

4.

would receive for each act, but had deleted the text messages because she was scared. Sierra also told McIntyre that she had told appellant at one point that child protective services and the police were looking for her, and appellant responded that child protective services were not going to do anything, and "[y]ou're not going anywhere." Marshai also told her the same thing.

McIntyre further testified victims of human trafficking are often vulnerable, in financial trouble, isolated, and/or prior victims of abuse. A pimp will use physical force threats or violence or a romantic relationship to gain control over a human trafficking victim. It is almost always the case for pimps to have sexual relationships with the prostitutes. The pimp will be the only person that provides the victim with food, money, or a place to stay. The pimps control the money prostitutes earn and it is common for prostitutes to have to ask permission for certain things. Pimps will often isolate the prostitute from family members and instruct them not to use social media. It is common for pimps to mentally, emotionally, and physically abuse their prostitutes to keep them from leaving.

Sierra's cell phone data revealed several attempts to get information on services from churches and homeless shelters and searches for job applications beginning in late January 2019. The data showed that in February 2019, Sierra began communicating with Marshai and appellant, who was in her phone as "Ray Daddy." The data revealed several phone calls between Sierra and appellant, sometimes multiple calls per day, between February 24, 2019 and March 6, 2019, as well as communications between other phone numbers regarding price negotiations for sexual acts.

## DISCUSSION

I. **Denial of Appellant's Request to Retain Private Counsel**

A. *Relevant Background*

Appellant was arraigned on the complaint on June 10, 2020, and was appointed the public defender to represent him. The public defender represented appellant through

the preliminary hearing and arraignment on the information until September 25, 2020, when the office declared a conflict, and appellant was referred to the Indigent Defense Program (IDP) for appointment of new counsel. A trial date of October 5, 2020, had been previously set.

On October 2, 2020, IDP attorney Gregory Mitts was appointed to represent appellant. The court vacated the October 5 trial date because Mitts was newly appointed and had not received discovery. At a subsequent hearing, the court set a trial date of November 30, 2020.

On November 20, 2020, Mitts informed the court that appellant was anxious to settle the case but that Mitts and the prosecutor were "still a bit apart." The court continued the trial date to December 7, 2020.

On December 4, 2020, the parties confirmed the trial date. However, on December 7, 2020, Mitts was quarantined due to COVID-19 and the trial was reset for December 21, 2020.

On December 21, 2020, both parties answered not ready for trial because of new discovery. The trial date was continued to January 11, 2021, over appellant's objection.

On January 11, 2021, Sierra was present from Ohio and available to testify. The prosecution answered ready, and Mitts answered not ready as he had just received more discovery. The court found good cause to continue the trial to January 14, 2021.

On January 14, 2021, the first day of trial, the court indicated that it had been informed in chambers that appellant and his family "have been efforting [*sic*] to hire a private attorney to represent" him. The court went on to explain the "problem that that posed to the Court" was that the case had "been around for a while" and had been assigned out to the trial court. The court explained for that reason, any new counsel would have to be ready to proceed or show good cause as to why they should be allowed to substitute in. The court further explained to appellant that he had "a right to have the attorney of your choosing if you are paying for that attorney, [but] that is only one of

6.

several competing factors that the Court would have to consider." The court asked appellant to confirm that the private attorney "has not officially been retained and is not making an appearance today," to which appellant responded, "Yes. He's getting retained today." The court told appellant that was "the problem" because "we're already in jury trial today." Appellant explained it was "the first effort that we are making today because yesterday was a holiday, so they discussed it, she would come in today and give him the money and she—later this week." The court went on to say that it would be moving forward with trial with appellant's appointed counsel, and in limine motions would be addressed that day and jury selection would start the next day.

Appellant then informed the court he felt there was a "conflict of interest." The court responded by asking appellant if he was "asking to have a hearing to see if another court-appointed attorney should be appointed?" Appellant replied, "I just want my attorney. That's all I want, sir." The court expressed concern because "[t]here are witnesses that are available that are from out of state, there are attorneys that have set aside the time, the Court has set aside resources to conduct this trial." The court indicated it did not believe appellant was attempting to manipulate the court and that it appeared appellant's request was "sincere" but it had to "balance that desire and that request with where we are in the proceedings."

Appellant told the court he did not believe that new counsel was needed earlier and began to explain why he currently felt counsel was not prepared for trial. The court then stated it would be conducting a *Marsden*[2] hearing, noting "while [appellant's] not using the terms of art that I normally expect, I do believe that that is, ultimately, what he is requesting."

At the closed hearing that followed, the court gave appellant the opportunity to explain why he did not want Mitts to represent him. Appellant stated that his mother and two sisters—witnesses he thought were important to his case—had not been interviewed,

---

[2]     *People v. Marsden* (1970) 2 Cal.3d 118.

7.

and he had never met or been given contact information for the defense's private investigator. Appellant explained that his family had had trouble getting into contact with Mitts. Appellant also expressed frustration that Mitts was not making enough of an effort to settle the case. Appellant told the court he wished to plead in exchange for concurrent time with his four-year sentence in another case. Appellant also told the court there were two occasions where Mitts had told appellant he was coming to see him but had failed to do so. Appellant further explained that his "speedy trial rights ha[d] been violated" and that Mitts allowed the prosecutor to trail the case too many times. Appellant stated that the victim "was originally on my side" and willing to make a video to that effect, but Mitts never contacted her.

In response, Mitts noted he did attempt to negotiate an offer with the district attorney but she was "passionate about this case" and "not in much of a settling mood." Mitts stated there was an offer of 20 or 30 years, and he had asked appellant what he would like to counteroffer. Mitts represented to the prosecutor that appellant's position was he would accept the same offer as Marshai, who was originally a codefendant, for a year in county jail and a three-year probation period. The prosecutor declined to extend the offer, and she and Mitts reached an "impasse." Mitts also indicated he had had some trouble getting a private investigator appointed but that one he was familiar with had been working with the defense for about a week or so. As for witnesses, Mitts expressed that the "witnesses in this matter could cut both ways" and that he had "worked diligently on this case" and was still considering, as a matter of trial strategy, which witnesses to call. Mitts also stated he had recently visited appellant. He explained that he had learned that appellant had called his diligence and work ethic into question with some of his family members and, at his visit with appellant, he asked him if he wanted to bring a *Marsden* motion, indicating it would not "hurt [his] feelings." Appellant told Mitts he wanted to keep him, that he had the money to hire an attorney, but wanted to keep his present counsel.

8.

When appellant was given a final opportunity to speak he stated, "Now, I feel like—since we, like—how I should say—put each other on blast, now I really feel uncomfortable with, you know, him representing me because of the things that I just, you know, said." Appellant noted, "what I'm saying [was] the truth, and the things he [Mitts] said also were the truth." Appellant stated he wanted a fair trial and that he "would get a fairer trial if I can get an attorney that I'm paying, that I know would really fight for me, you know, because he's paid." Appellant also noted that his family had discovered Mitts was on a six-month probation period due to lack of filing motions and that "plays a part and scares" him and his family.

In ruling, the court assured appellant it also wanted appellant to have a fair trial. Regarding settlement negotiations, the court pointed out there was a "big gap" between the offer appellant received at the beginning of the case and the four-year concurrent sentence he wished for. The court noted that "cases like this are not ones that [the district attorney's office] tend to negotiate," and there was nothing defense counsel could do about that. The court explained "if we were at a different stage in these proceedings, the desire for a privately retained attorney and the ability to bring a privately retained attorney into court would be analyzed perhaps a bit differently." The court concluded that granting appellant's request to bring in private counsel would "unreasonably disrupt the criminal proceedings." It would require the court to grant a continuance, leading to a further delay of the case, which, per the court was "already getting aged" because of continuances due to a number of circumstances, including COVID-19. The court noted the prosecution had witnesses in the county available for testimony and that appellant's family's efforts to retain private counsel "were started much later in the process than they should have been."

At that point, appellant again expressed concern that there were witnesses that had not been interviewed. In response, the court asked Mitts to confirm that he was ready on the case, to which Mitts responded he was. The court asked Mitts if "either directly or

through an investigator, have you or even by an offer of proof by somebody that may have identified these witnesses, do you have a belief as to what they would testify to if they were to be called as witnesses," to which Mitts responded that he did.  The court then asked Mitts, "And is that part of the consideration that you are contemplating and determining whether it is appropriate to call them," to which Mitts responded, "Correct." Mitts added that he would rather elicit the pertinent information from prosecution witnesses since presenting defense witnesses "can be a two-edged sword," so that he needed to wait until the prosecution's case-in-chief was completed to make his decision about witnesses.

The court subsequently found there was not good cause to relieve defense counsel as appellant's attorney.

Following the prosecution's case-in-chief, defense counsel stated on the record, out of the presence of the jury, his reasons for not calling witnesses on behalf of the defense.  He stated:

> "The three potential witnesses that we had contemplated were Marshai; Mrs. Lee, [appellant's] mother; and one of his sisters.  Upon reading Marshai's statement to the law enforcement in this case, it would have been far more harmful than helpful to the defense issues of [appellant's] character would have come up, prior bad acts, subsequent bad acts.  It was just fraught with peril for very little benefit, and he and I agreed—as a matter of fact, it was his idea not to call her.

> "The mother had very little corroborative to say.  Her only testimony would have been about the child of Sierra.  However, as the Court knows, witnesses can go far and wide and expose the witness to cross-examination that could be hurtful to [appellant].  Again, the profit/loss analysis determined that she not testify.

> "The other was a sister named LaSheri.  There is some possibility that she had a prostitution conviction or arrest on her record.  That wouldn't have gone over very well in this case.  And, again, her testimony would have been de minimus at best in favor of the defense.

10.

"So, jointly, [appellant] and I decided that we're satisfied with the state of the evidence as it stands and we are not in a position to call any witnesses who would benefit us."

### B.  *Analysis*

Appellant contends the trial court erred in denying his request to retain private counsel rather than proceed with appointed counsel, Mitts.  Appellant frames this as one general claim of error, citing a plethora of authority in support, including Sixth Amendment jurisprudence, *Marsden* and its progeny, and *People v. Courts* (1985) 37 Cal.3d 784 (*Courts*) and its progeny, at times conflating what we view as separate claims of error.  Thus, we find it necessary to reframe appellant's argument slightly.  In our view, the trial court reasonably interpreted appellant's request as two somewhat separate but interrelated requests—a continuance request to obtain private counsel and an independent request to have Mitts relieved (a *Marsden* request)—and conducted the *Marsden* hearing to consider both, as appellant's request to obtain private counsel was based on his claim Mitts was unprepared for trial and other dissatisfactions with Mitts's performance.[3]  Thus, in reviewing appellant's claim, we consider both requests and address them separately, recognizing, like the trial court, that they are interrelated, as consideration of both relies on many of the same facts.

First, we explain the court did not err by declining appellant's request to relieve Mitts, independent of his request to obtain private counsel.  Next, we separately conclude the court did not err by denying appellant's request to continue the trial so that he could retain private counsel, recognizing the reason for his request was his dissatisfaction with Mitts's performance.  Finally, to the extent appellant is arguing Mitts provided ineffective assistance of counsel at trial, we conclude this claim is not properly before us, as appellant's briefing failed to contain reasoned argument in support of such claim.

---

[3]  We disagree with respondent's characterization that appellant's request was not a *Marsden* motion.  We defer to the trial court's characterization of the request.

## 1. The Court's Denial of Appellant's Implicit *Marsden* Motion

In considering whether to grant or deny a defendant's motion to obtain new counsel on the basis that his appointed counsel is providing inadequate representation, commonly referred to as a *Marsden* motion, the trial court "must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance." (*People v. Smith* (2003) 30 Cal.4th 581, 604.) "A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (*Ibid.*) A trial court's inquiry is sufficient to develop a record for review when the court gives the defendant a "full opportunity to air all of his complaints, and counsel to respond to them." (*Id.* at p. 606.)

We review a court's denial for abuse of discretion. Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." (*People v. Smith*, *supra*, 30 Cal.4th at p. 604.)

Here, the trial court clearly gave appellant a full opportunity to air his complaints and for counsel to respond to them. As we will explain, the court's finding that Mitts could adequately represent appellant and thus his right to effective representation was not infringed upon was not an abuse of discretion.

Appellant's first contention with Mitts was that his mother and sister had not been interviewed. Mitts, however, after diligent questioning by the court, assured the court he was aware of what they would testify to, and because they could potentially be harmful to the case, he had decided to see if he could elicit the same information through cross-examination of the prosecution's witnesses. He represented he was prepared for trial. Whether to call certain witnesses is a matter of tactical or strategic decision. A defendant does not have the right to present a defense of his own choosing, but merely the right to

12.

an adequate and competent defense. (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1162.) "Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' " (*People v. Welch* (1999) 20 Cal.4th 701, 728–729.) The trial court could reasonably conclude that Mitts's failure to interview certain witnesses did not interfere with appellant's right to counsel.

Appellant next contended Mitts had not adequately attempted to negotiate a plea agreement with the prosecutor. The record indicates, however, that Mitts reasonably attempted to negotiate settlement of the case. Appellant expressed he desired concurrent time with a sentence he was serving in another case, and Mitts represented that he had tried to negotiate for a similar offer, but the prosecutor declined. The record contains support for Mitts's representation that the prosecution would not agree to the sentence appellant desired. The record indicates that on July 17, 2020, appellant rejected an offer of the low term doubled to 16 years, and the prosecution rejected the counteroffer of 32 months. The record further indicates that on November 20, 2020, Mitts indicated he and the prosecutor had had "brief conversations" with regard to settling the case because appellant was "anxious to" do so, but that he and the prosecutor were "still a bit apart" and he "d[id not] know how close we are going to get." The court's finding that Mitts could not be faulted for failing to successfully negotiate a plea agreement was reasonable.

With regard to appellant's contention that Mitts had not visited him often enough, the trial court was not compelled to relieve Mitts for that reason. The trial court thoroughly inquired of Mitts his preparation for the case, and Mitts assured the court he was ready for trial. When a court has satisfied itself that counsel is adequately prepared, it may deny a *Marsden* motion even if he or she had not communicated fully with his or her client. (*People v. Wharton* (1991) 53 Cal.3d 522, 580–581.)

13.

Appellant also criticized Mitts for failing to create a video of the victim while she was on appellant's "side," and allowing the district attorney to trail the case until she was willing to testify. It is true the matter was continued a number of times over appellant's objection, for various reasons, but we cannot say the record indicates any incompetence on Mitts's behalf in requesting these continuances. Mitts requested continuances due to being newly appointed, needing time to adequately prepare for trial to provide effective assistance, and receiving new discovery that needed to be reviewed. At one point, after announcing ready for trial, the trial date needed to be continued because Mitts had to be quarantined due to COVID-19.

Finally, with regard to Mitts's previous disciplinary action, the court was not unreasonable in not putting great weight on this. As respondent points out, a reviewing court does not presume ineffective assistance of counsel based on previous or pending disciplinary proceedings. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 44.)

In sum, the court could reasonably find that Mitts had not inadequately represented appellant nor that they had become embroiled in an irreconcilable conflict that would result in ineffective representation. Concluding the court did not abuse its discretion by finding no good cause to relieve Mitts, we turn to the court's denial of appellant's continuance request.

### 2. The Court's Denial of Appellant's Request for a Continuance to Obtain Private Counsel

"The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing.' " (*Courts*, *supra*, 37 Cal.3d at p. 789.) Trial courts "are required to 'make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney.' " (*Id*. at p. 790.) The right to counsel of one's choosing " 'can constitutionally be forced to yield *only* when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular

14.

case.' " (*Ibid.*)  "The right to such counsel 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.' " (*Ibid.*)

When a defendant is requesting a continuance to obtain counsel of his choosing, "[a] continuance may be denied if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.' " (*Courts*, *supra*, 37 Cal.3d at pp. 790–791.)  "[T]rial courts should accommodate such requests— when they are linked to an assertion of the right to retained counsel—'to the fullest extent consistent with effective judicial administration.' " (*Id*. at p. 791.)

We review for an abuse of discretion a court's denial of a defendant's motion for a continuance to enable his retained counsel to prepare for trial.  (*Courts*, *supra*, 37 Cal.3d at pp. 790–791.)  "[D]iscretion is abused only when the court exceeds the bounds of reason, all circumstances being considered." (*People v. Beames* (2007) 40 Cal.4th 907, 920.)  "In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case, 'particularly in the reasons presented to the trial judge at the time the request [was] denied.' " (*Courts*, at p. 791.)

Appellant contends the seminal case—*Courts*—is factually on point.  We disagree. In *Courts*, the defendant, charged with murder and use of a firearm, was appointed the public defender to represent him.  He was arraigned on July 19, and a trial date was set for October 26.  (*Courts*, *supra*, 37 Cal.3d at p. 787.)  In early September, appellant approached private counsel, Russell Swartz, with the intention of obtaining his services for trial.  (*Ibid.*)  At the time, the defendant could not afford Swartz's services but told him he wanted to try to raise the retainer, and the two met several times to discuss fee arrangements and other aspects of the case.  (*Ibid.*)  On October 18, at a trial setting conference, the public defender informed the court that the defendant wanted a

continuance in order to obtain private counsel. (*Ibid*.) The defendant informed the court Swartz had been on vacation, and the defendant was unable to conclude financial arrangements. (*Id*. at pp. 787–788.) The court denied the request stating it was "too late." (*Id*. at p. 788.) The defendant continued to meet with Swartz and on October 21, paid a retainer. (*Ibid*.) Both Swartz's office and the public defender attempted to calendar a date for substitution but were unsuccessful. (*Ibid*.) On October 26, the judge who had conducted the pretrial proceedings was disqualified. (*Ibid*.) The public defender renewed the motion for a continuance before the new judge, and Swartz testified he was willing to represent the defendant but that a continuance was necessary. (*Ibid*.) The court denied the request because the "retainer" in effect was "not a retainer" since it was accepted on the ground there would be a continuance. (*Ibid*.) The court subsequently reconsidered the motion, including a new declaration by the defendant outlining the steps he took to retain Swartz, and denied it again without comment. (*Id*. at pp. 788–789.) Trial commenced, and the jury found the defendant guilty of involuntary manslaughter and the gun allegation true. (*Id*. at p. 789.)

The Supreme Court found the trial court abused its discretion in denying the continuance noting the record "establishe[d] that [the defendant] engaged in a good faith, diligent effort to obtain the substitution of counsel [nearly two months] *before* the scheduled trial date." (*Courts*, *supra*, 37 Cal.3d at p. 791.) The *Courts* court reasoned that as the defendant had established an attorney-client relationship with Swartz and was not requesting a continuance to obtain private counsel, he was not " 'unjustifiably dilatory' in attempting to obtain the services of counsel of his own choosing." (*Ibid*.) The court explained that the defendant's first request was timely yet "premature" as a retainer had not been paid. It nonetheless concluded the trial court's comment that it was " 'too late' " was "not a correct reading of the law." (*Id*. at p. 792.) The *Courts* court, relying on the defendant's subsequent steps to pay the retainer three days later, noted that the defendant's diligence in securing private counsel was genuine. (*Id*. at p. 794.) The

court concluded the defendant had taken "reasonable and timely steps to create a relationship with private counsel." (*Ibid.*)  In contrast, the *Courts* court found "no circumstances which warranted the limitation of [the defendant's] right to counsel based on considerations of judicial efficiency," noting no evidence on the record that the court or parties would be inconvenienced by a continuance, such as evidence of congestion of the courts or hardship of witnesses or jurors.  (*Id.* at pp. 794–795.)

The trial court here did not abuse its discretion by concluding *Courts* was distinguishable and that appellant's request constituted an "unreasonable disruption to our criminal proceedings."  Here, in contrast to *Courts*, where "a lawyer-client relationship had been established," appellant had not yet retained private counsel at the time he made his request.  The trial court was thus faced with the " 'uncertainties and contingencies' " of an accused who wanted a continuance to obtain private counsel.  (*Courts*, *supra*, 37 Cal.3d at p. 791; *People v. Butcher* (1969) 275 Cal.App.2d 63, 69 [reviewing court found abuse of discretion where "[the] [a]ppellant was not requesting a continuance to obtain private counsel and the court was not faced with the uncertainties and contingencies of that circumstance [and the] [a]ppellant's privately retained counsel was before the court and willing to commit himself to a date one week hence."].)  Appellant admitted to the trial court that his family would be making their "first effort" to pay the retainer that day and offered no other information about his desired counsel's availability or when they would be prepared for trial.  This contrasts with the well-developed record of the attorney-client relationship that had been established in *Courts*.  Further, unlike *Courts*, where "the prosecutor failed to express any valid concern about an inconvenience to witnesses which might have resulted if a continuance had been granted" (*Courts*, at pp. 794–795), in the present case, the prosecution had arranged for Sierra to travel from out of state to testify.  Sierra was available on January 11, and the matter had to be continued three days because the defense had just received new discovery.

Appellant contends "grave concerns of appointed counsel's inadequate representation should have been factored into the trial court's decision." (Unnecessary capitalization omitted.) This contention is belied by the fact that the trial court conducted a *Marsden* hearing, giving appellant ample opportunity to explain the alleged problems with Mitts's performance and engaging in a thorough inquiry of appellant and Mitts regarding appellant's allegations. As we have stated, the trial court appeared to consider appellant's request as both a continuance to obtain private counsel as well as a *Marsden* motion and considered the alleged inadequacies in making its decisions on both. The record indicates the court took appellant's claims seriously and, had there been a showing of ineffectiveness, would have considered either substituting other counsel or allowing appellant more time to retain private counsel.

In considering all the circumstances surrounding appellant's request, we conclude the court did not abuse its discretion in denying appellant's request for a continuance to retain private counsel.

### 3. Appellant's Suggestion that Mitts Provided Ineffective Assistance of Counsel

Finally, to the extent appellant is arguing Mitts actually provided ineffective assistance of counsel during trial, we reject this claim. Appellant focuses the vast majority of his briefing on the trial court's denial of his request to obtain private counsel, as well as the court's declining to relieve Mitts at the commencement of trial based on appellant's representations he was not adequately prepared for trial. At the end of his opening brief, however, he lists several ways Mitts's representation put appellant at a "disadvantage": "the failure of counsel to file a *Pitchess*[4] motion, in regard to the possible influence of the most critical testimony of the victim witness (given that when the investigating officer was interviewing this witness a second time, he had promised

---

**4**    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

18.

that if she corroborated, she could get her son back from Child Protective Services[;][5]

failure of counsel to effectively investigate the victim witness's extraneous offense

involving an arrest for loitering in a public place with intent to commit prostitution,

which a relative of [appellant] had discovered[;][6] failure of counsel to state *outside* the

---

**5** Mitts cross-examined Detective McIntyre extensively on this topic. It was revealed that during an interview with Sierra, McIntyre said, "[W]e're just going to ask you to look through your phone to see if you have any messages from [Marshai] to kind of corroborate what happened. That way, we can get your son back. And if she … tell us what she's doing, you know what I'm saying? As opposed to denying everything and putting this on you." Mitts questioned McIntyre about whether he told Sierra that if she cooperated he would help her get her son back, and McIntyre denied that was the "way that it was said." McIntyre further denied, following more questioning from Mitts, that he indicated to Sierra he had the "power" to get her son back. McIntyre explained: "Well, did I tell her, 'I have the power to give you your son back'? If that's how it's interpreted, that's not what I meant. That's certainly not what she thought as well, given our entire conversation. I told her that her child was under CPS custody. I never told her that if you do, this I will give you your child back. I have no right to tell her that because I don't have that power."

Mitts questioned Sierra on this topic as well. He asked her, "did [the police] say anything to the [e]ffect that, you know, 'If you tell us the truth, maybe there's something we can do. If you lie to us, then we can't help you with CPS'?" Sierra responded, "No. They automatically told me that he was going to foster care because of the situation." Mitts asked Sierra, "Did it enter your mind that if you told the officers what they wanted to hear, that you had a better chance of getting your child back from Child Protective Services?" Sierra responded, "No."

When the prosecutor asked McIntyre on direct examination if he threatened Sierra regarding the custody of her child, he answered, "Absolutely not. Our main goal at that point was to recover the child safely."

**6** During Sierra's testimony, Mitts sought to introduce evidence of Sierra's conviction for loitering in a public place with the intent to prostitute, the arrest for which happened three weeks after the incident underlying the present case. As to the late discovery of this conviction, Mitts explained: "[The prosecutor] and I went over the RAP sheet and this wasn't on the RAP sheet. I had … my investigator … run the RAP sheet. He got the same thing that [the prosecutor] got, and it was only until one of defendant's relatives found it on the Fresno County Superior Court website that I became aware of it."

The court ruled the evidence was admissible over the prosecutor's objection. The prosecutor raised the issue with Sierra on redirect examination and she explained she was waiting for a ride and was not intending to engage in prostitution. Mitts questioned her

presence of the jury his intent to call to the stand: Marshai Roberson, Mr. Miller's mother, Tabitha Lee, and Mr. Miller's sister, LaSheri.[7]" Appellant also spends a substantial amount of his briefing discussing the case of *Brooks v. Yates* (9th Cir. 2016) 818 F.3d 532, 533 (*Brooks*), where the appellant, who had been represented by Mitts, appealed from the dismissal of a habeas petition as untimely. The Ninth Circuit found the district court abused its discretion by concluding Mitts had not "abandoned" the appellant for the purposes of applying equitable tolling. (*Id*. at p. 534.) The court noted the record demonstrated that Mitts was "grossly negligent" in his representation of the appellant by failing to respond to the court's order to show cause why the petition should not be dismissed as untimely, and failing to communicate with the appellant in general regarding the order. (*Id*. at pp. 534–535.)

To prevail on an ineffective assistance of counsel claim, appellant must establish that (1) the performance of his trial counsel fell below an objective standard of reasonableness and (2) prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Anderson* (2001) 25 Cal.4th 543, 569.) "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims

on the case on recross-examination, and she revealed she pled no contest in exchange for a conditional dismissal but the case was never dismissed. Sierra said she had "[n]o explanation" as to why she was in a place where prostitution was prevalent only weeks after the incident underlying the present case.

7       This is a misrepresentation of the record. At page 678 of the reporter's transcript, Mitts began his explanation of why he did not call certain witnesses directly after the court noted, "The jury is not present. We are in open court, but without the jury present."

20.

of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

To establish prejudice under *Strickland*, an appellant " 'must establish "prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." ' " (*In re Cox* (2003) 30 Cal.4th 974, 1016.) " '[I]t is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." ' [Citation.] To show prejudice, [the] defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.] 'The likelihood of a different result must be substantial, not just conceivable.' " (*People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367.)

Here, appellant goes into little detail about how any of Mitts's specific acts or omissions constituted ineffective assistance and, more importantly, does not go into any detail of how they resulted in *Strickland* prejudice. Appellant's comparison to *Brooks* and his conclusion that this court should find, like the Ninth Circuit did in *Brooks*, that Mitts was "grossly negligent," is not persuasive. Except for the fact that Mitts was the attorney, *Brooks* shares few similarities to the present case. It was in a vastly different procedural stance, considered a different issue, and, most importantly, Mitts's performance actually resulted in an adverse effect on the appellant—the dismissal of his petition. As we have stated, appellant has not established, nor attempted to establish, a reasonable probability he would have received a more favorable outcome had it not been for Mitts's alleged deficiencies.

Without further discussion, we conclude appellant's ineffective assistance of counsel claim is not properly before us and reject it. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [" '[E]very brief should contain a legal argument with citation of

authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "].)

## II.    Senate Bill 567

Effective January 1, 2022, Senate Bill 567 amended section 1170, restricting a trial court's sentencing discretion, including its ability to impose the upper term for a conviction.  (Stats. 2021, ch. 731, § 1.3.)  Pursuant to Senate Bill 567, section 1170 now precludes a trial court from imposing a sentence exceeding the middle term for any offense with a sentencing triad, unless "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  (§ 1170, subd. (b)(1) & (2).)  In other words, Senate Bill 567 provides for a presumptive middle term absent the presence of circumstances in aggravation, the facts underlying which have either been stipulated to by the defendant or proven beyond a reasonable doubt at trial.  (§ 1170, subd. (b)(1) & (2); *People v. Lopez* (2022) 78 Cal.App.5th 459, 464.)

Here, the court found the following circumstances in aggravation:  (1) "the victim was particularly vulnerable"; (2) appellant "induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission"; (3) appellant "potentially" unlawfully prevented or dissuaded witnesses from testifying; (4) "the manner in which the crime was carried out indicates planning, sophistication, or professionalism"; (5) appellant "has engaged in violent conduct which indicates a serious danger to society as evidenced by the current case and prior convictions for [section] 246, and [section] 273.5(a)"; (6) appellant's "prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous"; (7) appellant "has served two prior prison terms"; (8) appellant "was on post-release community supervision when this crime occurred"; and (9) appellant's "prior

22.

perform on felony probation, parole, and post-release community supervision was unsatisfactory in that he failed to comply with the terms and re-offended."

The parties agree, as do we, the amended version of section 1170, subdivision (b) applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.) The parties further agree that remand for resentencing is required. Without further discussion, we remand for resentencing.

## **DISPOSITION**

Appellant's convictions are affirmed. The matter is remanded for resentencing in compliance with all applicable laws.


                                                          DE SANTOS, J.

WE CONCUR:


PEÑA, Acting P. J.


SMITH, J.